4 A.3d 561

MELISSA LEE, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFF–APPELLANT, v. CARTER–REED COMPANY, L.L.C., A/K/A THE CARTER REED COMPANY, BASIC RESEARCH, L.L.C., DG ENTERPRISES, INC., ALPHAGENBO TECH, L.L.C., BODY FORUM, L.L.C., BODY INNOVENTIONS, L.L.C., COVARIX, L.L.C., COVAXIL LABORATORIES, L.L.C., BYDEX MANAGEMENT, L.L.C., WESTERN HOLDINGS, L.L.C., DENNIS W. GAY, AND NATHALIE CHEVREAU, DEFENDANTS–RESPONDENTS.

Argued April 27, 2010—Decided September 30, 2010.

498

500

502

*Jeffrey I. Carton,* a member of the New York bar, admitted pro hac vice, argued the cause for appellant (*Meiselman, Denlea, Packman, Carton & Eberz,* attorneys; *Mr. Carton, Barry B. Cepelewicz,* a member of the New York bar, and *Jill C. Owens,* a member of the New York bar, admitted pro hac vice of counsel and on the briefs).

*Gary F. Bendinger,* a member of the Utah and New York bars, admitted pro hac vice, argued the cause for respondents (*Howrey,* attorneys; *Mr. Bendinger, James G. McCarney,* and *Kenneth M. Kliebard,* a member of the Illinois bar, admitted pro hac vice on the briefs).

*Anita R. Hotchkiss* submitted a brief amicus curiae on behalf of Product Liability Advisory Council, Inc. (*Goldberg Segalla,* attorneys; *Ms. Hotchkiss* and *Steven S. Vahidi,* on the brief).

*Mark R. Cuker* submitted a brief amici curiae on behalf of Public Citizen, Inc., Center for Science in the Public Interest,

National Association of Consumer Advocates, and National Consumer Law Center (*Williams Cuker Berezofsky,* attorneys).

Justice ALBIN delivered the opinion of the Court.

A class-action lawsuit can give a large number of consumers with small claims the power to act collectively in seeking redress against a corporate entity. In this appeal, we must decide whether denying thousands of individuals the opportunity to proceed as a class in a consumer-fraud action was an abuse of discretion.

Plaintiff Melissa Lee purchased, for a price of about $120, three bottles of a dietary supplement pill called Relacore, which is manufactured and distributed by defendant Carter–Reed Company, L.L.C. Carter Reed has marketed Relacore primarily as a weight-reduction product with the additional benefits of lessening anxiety and elevating mood. Plaintiff filed a class-action lawsuit on behalf of thousands of New Jersey consumers, alleging that Carter Reed sold Relacore using various mass-marketing deceptions that violated the New Jersey Consumer Fraud Act, breached express and implied warranties, and unjustly enriched Carter Reed. In her complaint, plaintiff contends that there is no scientific support that Relacore provides any of the benefits claimed by Carter Reed.

Plaintiff filed a motion to certify as a class all New Jersey consumers who have purchased Relacore. Plaintiff maintains that only through the aggregation of thousands of small claims in a class action will similarly situated consumers have a financially feasible vehicle to prosecute their cases against Carter Reed.

The trial court denied plaintiff's class-certification motion on the ground that prosecution of thousands of claims dependent on so many individualized factors would be unmanageable under *Rule* 4:32–1(b)(3). The Appellate Division affirmed the denial of class certification, but for different reasons, finding that the individual issues of fact and law predominated over those that were common to the class members.

We now reverse. For purposes of the class-certification motion, the trial court and Appellate Division failed to accept as true the allegations asserted in plaintiff's complaint or to view the pleadings in a light favorable to plaintiff, as required by our jurisprudence. Had those courts viewed the pleadings in the proper light at this stage of the proceedings, and accepted plaintiff's representations that Carter Reed's advertising of Relacore was no more than a passel of lies, then they should have concluded that the common issues of fact and law predominated over individual ones and that the case was not beyond the management skills of our capable Superior Court judges. We hold that plaintiff has satisfied the requirements of *Rule* 4:32–1(b)(3) and that a class action, rather than the prosecution of thousands of individual small claims, is the superior method for proceeding in this case.

## I.

### A.

#### *Standard of Review*

In deciding whether to grant or deny class certification, a trial court does "not decid[e] the ultimate factual issues" underlying the plaintiff's cause of action. *See Riley v. New Rapids Carpet Ctr.*, 61 *N.J.* 218, 223, 294 *A.*2d 7 (1972). Rather, at the class-certification stage, a court must "accept as true all of the allegations in the complaint," *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 192 *N.J.* 372, 376, 929 *A.*2d 1076 (2007), and consider the remaining pleadings, discovery (including interrogatory answers, relevant documents, and depositions), and any other pertinent evidence in a light favorable to plaintiff, *see Iliadis v. Wal–Mart Stores, Inc.*, 191 *N.J.* 88, 96, 922 *A.*2d 710 (2007). Although a plaintiff is accorded "every favorable view of the complaint and record," *ibid.* (citation and internal quotation marks omitted), the trial court nevertheless must engage in a "rigorous analysis" to assess whether the requirements of class certification have been met under *Rule* 4:32–1(b)(3), *id.* at

106–07, 922 *A*.2d 710 (citation and internal quotation marks omitted). The trial court must understand and analyze the "claims, defenses, relevant facts, and applicable substantive law" in determining whether a class action: (1) presents common issues of fact and law that predominate over individual ones, (2) is a superior means of achieving efficient and just results, and (3) is manageable. *Id.* at 107, 922 *A*.2d 710 (citation and internal quotation marks omitted); *R.* 4:32–1(b)(3).

An appellate court must ascertain whether the trial court has followed these standards and properly exercised its discretion in granting or denying class certification. *See In re Cadillac V8–6–4 Class Action,* 93 *N.J.* 412, 436, 461 *A*.2d 736 (1983). We now review the record through the prism of the standards governing the certification of a class action. We start by looking at the allegations set forth in plaintiff's complaint.

## B.

### *The Complaint*

In 2007, plaintiff Melissa Lee filed a second-amended class-action complaint against defendant Carter–Reed Company, L.L.C.,[1] (and multiple other related entities and individuals) in the Superior Court, Law Division, Union County.[2] Plaintiff claimed that Carter Reed's distribution and marketing of Relacore, a

---

[1] The first class-action lawsuit against Carter Reed was filed in 2004 and named not only Ms. Lee, but also nineteen other plaintiffs representing a putative nationwide class. In 2006, plaintiffs did not oppose Carter Reed's motion to limit the class action to New Jersey residents. As a result, Ms. Lee remained as the only plaintiff and class representative. In early 2006, Carter Reed removed the case to the United States District Court of New Jersey pursuant to 28 *U.S.C.* § 1446 and 28 *U.S.C.* § 1332. However, at the end of the year, the federal court granted plaintiff's motion to remand the matter to state court. The allegations in the second-amended complaint are set forth in this opinion.

[2] The complaint names as defendants: Carter–Reed Company, L.L.C., a/k/a The Carter Reed Company; Basic Research, L.L.C.; DG Enterprises, Inc.; Alphagenbo Tech, L.L.C.; Body Forum, L.L.C.; Body Innoventions, L.L.C.;

dietary supplement pill, violated the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –181,[3] breached express and implied warranties made by Carter Reed, and unjustly enriched it at the expense of New Jersey residents who purchased Relacore. Plaintiff, a New Jersey resident, purchased Relacore from a CVS store in 2004. She claims that she bought Relacore based on Carter Reed's false representations about its product. Although the promised benefit of taking Relacore was the reduction of belly fat, plaintiff—after using the product as directed for approximately four months—gained weight instead. Plaintiff seeks to certify a state-wide class of thousands of New Jersey citizens who purchased Relacore based on Carter Reed's mass-marketing deceptions.

In or about 2002, Carter Reed began marketing Relacore through advertisements on television, in the print media, on its website, and on the packaging and labeling of each bottle sold.[4] Through its promotional campaign, in various ways, Carter Reed described Relacore as a product that would "shrink belly fat, improve users' mood, and combat the medical condition known as 'metabolic syndrome.'"[5] Carter Reed touted Relacore as a "breakthrough anti-anxiety, mood elevating pill that helps cut

---

Covarix, L.L.C.; Covaxil Laboratories, L.L.C.; Bydex Management, L.L.C.; Western Holdings, L.L.C.; Dennis W. Gay; and Nathalie Chevreau. These defendant-companies are all entities controlled by Dennis Gay, chief executive officer, president, and principal shareholder of Carter Reed. Nathalie Chevreau, Ph.D., provided testimonials promoting Relacore in Carter Reed's advertisements. For the sake of convenience, all defendants are referred to as Carter Reed.

[3] On December 1, 2010, new provisions of the CFA, *N.J.S.A.* 56:8–185 to –95, not relevant to this case, will take effect.

[4] Although not in the complaint, it is undisputed that Relacore was advertised in radio spots and through promotional materials distributed to pharmacies and other retailers.

[5] According to the complaint, "true metabolic syndrome is a disease involving the occurrence together of obesity, dyslipidemia (which is characterized by

stress-related cortisol production." Cortisol—according to Carter Reed—is a " 'nasty little stress hormone' " naturally produced by the body that causes "pound after pound to accumulate around your waist and tummy." Relacore is advertised as a " 'feel good pill' that will 'naturally shrink your belly fat,' leav[ing] its users 'feeling happier, [and] full of energy' "—"short-circuiting the 'stress-to-belly-fat cycle.' "

The complaint contends that every benefit ascribed to Relacore in its multi-media advertising, including those in testimonials by "Dr." Chevreau, is false. The complaint alleges that Relacore does not relieve anxiety, improve the user's mood, or shrink belly fat. According to the complaint, "there has been no scientific validation of a causal relationship between cortisol production and weight gain, or cortisol reduction and weight loss." Additionally, the complaint charges that "[t]here is no reasonable scientific evidence supporting any of [the] claims" that "Relacore is formulated to help 'Reduce Stress', 'Reduce Mild Anxiety', 'Improve Mood', 'Fight Mid–Day Fatigue', and 'Increase Energy.' "

Plaintiff and the putative class members seek compensatory and punitive damages, injunctive relief, and attorneys' fees, but do not seek damages for any personal injuries.

In its answer, Carter Reed denied plaintiff's allegations that Relacore did not provide the benefits advertised and raised as an affirmative defense that "[t]he proposed class cannot be certified because it does not meet the requirements set forth in [*Rule*] 4:32–1."

The trial court had set a discovery timeline even before the filing of the second-amended complaint. The parties exchanged interrogatory answers, documents, and expert reports, and plaintiff and Esther Anderson, a corporate representative of Carter Reed, were deposed. We now turn to what was learned in discovery.

---

elevated levels of triglycerides and low levels of high-density lipoprotein choles-terol), hyperglycemia, and hypertension."

*Discovery*

Plaintiff is married, has four children, and works as a sales consultant for an automobile dealership. In about 2004, she saw advertisements for Relacore in magazines called "First" and "Women's World," and on television. A full-page promotional for Relacore in one edition of "First" begins with a question in large bold letters: "Can a natural 'feel good pill' get rid of belly fat?" The advertisement provides the answer, stating that "Relacore is the natural anti-stress, mood elevating pill that can help positively alter the underlying causes of excess belly fat ... leaving you happier, full of energy, and with that flat, youthful tummy you never thought you'd see again."

Plaintiff purchased a bottle of ninety pills of Relacore—a thirty-day supply—at a CVS Store in Rahway for $39.99 in 2004. She read the representations on the bottle. The labeling on one such bottle states: "Stress Reducer/Mood Elevator ... Helps Prevent Stress–Related Abdominal Fat." The box containing the bottle refers to Relacore as a dietary supplement. Plaintiff bought Relacore because it promised to shrink belly fat, and she expected the product to work as advertised. She did not see results in the first thirty days and purchased a second bottle, and eventually a third one. After completing two bottles and at least part if not all of the third, and despite regular exercise, plaintiff observed that she had gained, not lost, weight.

The print, television, radio, and internet advertisements reveal that the targeted audience was women and that the core message was that Relacore was a weight-loss product with the additional benefits of reducing anxiety and elevating mood. Many of the ads picture a young slender woman, clad in undergarments or night-wear, standing on a scale and smiling—seemingly content with her experience with Relacore. Here is a sampling of the representations made in those ads:

1. "All–Natural 'Feel Good Pill' Weight Loss Breakthrough ... now you can beat stress-induced belly fat with Relacore ... The Most Significant Weight Control Advancement In More Than A Decade ... Relacore is the natural anti-stress,

mood elevating pill that can help positively alter the underlying cause of excess belly fat. . . ." (Carter Reed website ad).

2. "High levels of cortisol . . . cause pound after pound of excess body fat to accumulate around your waist and tummy . . . a health-threatening, figure-destroying condition affecting an estimated 47 million Americans . . . mostly women. . . . But now you can beat stress-induced belly fat with Relacore . . . that helps cut cortisol production by short-circuiting the 'stress-to-belly-fat cycle.' " (Carter Reed website ad).

3. "Shedding Excess Belly Fat Can Be As Easy As 1·2·3 . . . Relacore (REL·a·KOR), the all-natural anti-stress, 'feel-good pill' is fast becoming the formula of choice for those who want to lose belly fat." (Retail brochure 2002).

4. "Diet Failure is Not Your Fault. . . . When you are over 30, over stressed, and want to get rid of stubborn belly fat, the answer is Relacore . . . Satisfaction Guaranteed or Your Money Back. Call Now! . . . 100% 30–Day Money–Back Guarantee." (Television ad).

5. "As Featured On TV . . . Helps Reduce Stress Induced Cortisol . . . Control Belly Fat . . . Increase Energy." (Relacore box).

Although the packaging and labeling of Relacore made no representation of a money-back guarantee if the user was dissatisfied, Carter Reed did convey, in some but not all ads, that a customer would receive a "full, prompt, no-questions-asked refund" if not satisfied with the product.[6]

Esther Anderson, a compliance specialist with Carter Reed, testified at her deposition that the company had a thirty-day money-back guarantee policy for Relacore, but that company officials had authorized refunds requested beyond the thirty-day period, and indeed hundreds of refunds had been given. She admitted that Carter Reed's marketing scheme targeted New Jersey consumers.

Carter Reed made approximately 15,000 sales to New Jersey consumers as of 2007, and had records for eighty to eighty-five percent of those sales.

Carter Reed submitted the reports of two experts. In his report, Martin Block, Ph.D., a professor at Northwestern Univer-

---

[6] The factual presentation here is based on documents that are part of the record. Although at oral argument before this Court counsel for Carter Reed stated that labeling on the Relacore bottles and boxes varied over time, we can rely only on the documents before us.

sity, explained that a consumer's decision to purchase a product is based on a host of individual factors. In another report, Daniel Hoffman, Ph.D., a professor at Rutgers University, expressed the view that a wide variety of factors contribute to a person's weight loss.

In response, plaintiff submitted the expert reports of Jonathan Waitman, M.D., an internist specializing in clinical nutrition, and Warren J. Keegan, D.B.A., a professor of marketing. Dr. Waitman expressed the opinion that "there is no scientific basis for the claims of the efficacy of Relacore as to stress relief, mood elevating energizing qualities, mitigation of Metabolic Syndrome, reduction of belly fat, or reduction of cortisol level." Mr. Keegan concluded that if Carter Reed's claims about the benefits of Relacore were untrue, then Carter Reed marketed the product in a deceptive manner.

Both parties successfully moved to strike the other's expert reports. At the time the trial court rendered its decision concerning class certification, it struck plaintiff's reports because of her failure to provide the names of her experts in response to interrogatory questions and, apparently, because of her failure to file the reports within the designated discovery period. The court also struck Carter Reed's reports because its experts offered opinions that fell within the realm of "common knowledge" and therefore would not assist the court in resolving the class-certification issues.[7]

## C.

### Trial Court

The trial court denied plaintiff's motion for class certification. The court first determined that plaintiff had satisfied the four

---

[7] Both parties moved for leave to appeal the trial court's decision to strike their expert reports. The Appellate Division denied their respective motions. The correctness of the trial court's decision in striking those reports is not before this Court.

general requirements of the class-certification rule, *Rule* 4:32–1(a): numerosity (finding that "there are well over 10,000 members of the class"); commonality (finding that "[p]laintiff's theory is applicable to the entire class"); typicality (finding that "[p]laintiff's claims arise from the same general circumstances as other class members"); and adequacy of representation (finding that plaintiff can "fairly and adequately protect the interest of the class"). The court, however, concluded that plaintiff did not meet the manageability requirement for class certification. *See R.* 4:32–1(b)(3)(D). The court believed that "individualized factors which would require evidentiary hearings as to each member of the class" presented "insurmountable" difficulties to managing the class as a whole. To prove the unmanageability of the case as a class action, the court identified at least fourteen inquiries that would have to be made of each class member:

[1] whether [the class members] bought the product to reduce belly fat, reduce stress or fight metabolic syndrome;

[2] whether they read the magazine advertisements, and if so which ones;

[3] whether they viewed any television commercials and if so, which ones;

[4] the extent to which the advertisements were relied upon in making the purchase;

[5] whether the purchaser bought the product at the recommendation of a friend, relative, or store employee;

[6] whether some of the alleged benefits of Relacore were experienced by the class member in question, and if so, which benefits;

[7] whether the health condition of the class member affected the efficacy of [the] product;

[8] whether the class member followed directions, and which direction the member followed;

[9] whether any of the plaintiffs took medication, and if so, which medication they were taking;

[10] whether there was a causal nexus between the alleged wrongful acts of the defendants and an ascertainable loss;

[11] the amount of money paid by the consumer;

[12] price or any other factor upon which the purchase was based;

[13] whether they suffered an ascertainable loss as necessary under the CFA; [and] .

[14] whether a refund was requested and received.

The court maintained that the "individual questions defeat[ ] the purpose of litigating any prospective claims in a class action lawsuit because the essential common thread that unites class action plaintiffs is missing." It acknowledged that, without the vehicle of a class action, individual actions would not likely be filed because any one case involves a small monetary claim. Nevertheless, the court determined that the class was not manageable under *Rule* 4:32–1(b)(3)(D) because litigating the Consumer Fraud Act, unjust-enrichment, and express- and implied-warranty claims would require "the undertaking of thousands of hearings."

## D.

### Appellate Division

The Appellate Division granted plaintiff's motion for leave to appeal and, in an unpublished opinion, affirmed the trial court's order denying class certification. Noting that the denial of class certification on the basis of manageability is "disfavored," (quoting *Iliadis, supra*, 191 *N.J.* at 117, 922 *A.*2d 710), the appellate panel instead turned its focus on whether the common issues of fact and law predominated over individual ones. *See R.* 4:32–1(b)(3). The panel considered that "the central issue for the consumer fraud claim is the existence of a causal nexus between the wrongful conduct and any loss." It stated that, although plaintiff asserts "she was induced by the false representations to purchase and use" Relacore, she could not know "whether putative class members even saw the print or Internet advertisements or whether they purchased the product due to a recommendation from a friend or family member." The panel also emphasized that "the Relacore market campaign is multi-faceted," with some ads touting Relacore as "a belly fat retardant," others as "a mood elevator," and yet others as a "stress reducer," thus making it impossible to know the reason why any putative class member purchased the product.

Like the trial court, the panel observed that the small nature of the individual claims made it unlikely that any one person would

pursue litigation to assert his or her rights. Nonetheless, the panel concluded that the multi-faceted marketing campaign by Carter Reed, even though it offered only a single product, meant that, at best, "plaintiff and the putative class members suffered losses from a variety of sources not common to all."

"[T]he multiple qualities attributed to [Relacore] and the variety of advertising campaigns and media outlets utilized by [Carter Reed]" compelled a finding—according to the panel—"that a common core of facts and law does not predominate to allow class treatment" for plaintiff's Consumer Fraud Act, unjust-enrichment, breach-of-warranty, and common-law-fraud claims. Thus, the Appellate Division held that "the trial judge properly denied class certification for this mass media false advertising claim."

### E.

We granted plaintiff's motion for leave to appeal. *Lee v. Carter–Reed Co.*, 200 *N.J.* 469, 983 *A.*2d 197 (2009). We also granted the joint motion of Public Citizen, Inc., Center for Science in the Public Interest, National Association of Consumer Advocates, and National Consumer Law Center (collectively Public Interest Groups), and the motion of the Product Liability Advisory Council, Inc., to participate as amici curiae.

### II.

Plaintiff submits that the Appellate Division failed to faithfully honor New Jersey's jurisprudence, which favors the use of the class action in cases involving consumer fraud. Plaintiff maintains that, in this class action, the common legal and factual issues shared by plaintiff and the class members arising from Carter Reed's "uniform core deception" that Relacore rids "the user of belly fat by regulating stress" will predominate over any individual questions. She asserts that the trial and appellate courts "conflated predominance with a requirement of a total absence of individual issues, although it is well settled that the existence of individual issues does not defeat class certification." She further indicates

that those courts concentrated "on possible insignificant differences about the class members' experience with [Relacore]" and challenges the "laundry list of [fourteen] purported individual issues" identified by the trial court and seemingly adopted by the Appellate Division.

She claims that the important point is whether she complied with the requirements of *Rule* 4:32–1(b)(3), not whether a mass-media false-advertising case has previously been certified as a class action in New Jersey. From plaintiff's viewpoint, a corporation's misleading advertising scheme through use of the mass media is no less immune to the class-action approach than other forms of consumer fraud. She also points out that the Appellate Division wrongly characterized her common-law fraud claim as one of her "dominant claims" when, in fact, she voluntarily dismissed that claim before she even filed her second-amended complaint, which, in turn, makes no mention of common-law fraud.

Plaintiff believes that the class action is the superior means of resolving the claims of thousands of defrauded New Jersey consumers and that any difficulty concerning a causal nexus between Carter Reed's misrepresentations and the purchase of Relacore by individual class members can be dealt with by the use of questionnaires, interrogatories, or a special master.

Amici Curiae Public Interest Groups argue that the trial court and Appellate Division erred in denying class certification by disregarding "the fact that *all* of Relacore's claimed benefits are alleged to be false and that *all* of those false claims appear on the product label itself." Amici contend that both courts "fundamentally misunderstand[ ] the nature of a product like Relacore." Amici explain that Relacore is a "credence good," that is, Relacore is known to consumers only by the representations made about the product by its distributor, Carter Reed. Thus, "[c]onsumers cannot possibly know what Relacore does, let alone have any predilections for it, unless and until they are exposed to messages about its properties or benefits." In other words, consumers would only purchase Relacore if exposed to Carter Reed's adver-

tising campaign. According to amici, because every purported benefit of Relacore claimed by Carter Reed was false, in making a purchase every class member must have been exposed in some way to the false advertising of Relacore, particularly the misrepresentations on the packaging and labeling of the product.

Carter Reed maintains that the trial court and the Appellate Division both correctly concluded that individual issues predominate over common, class-wide issues and that a class action would not be manageable. In particular, Carter Reed stresses that the nexus between causation and ascertainable loss—essential elements to a Consumer Fraud Act claim—cannot be determined on a class-wide basis because Relacore was marketed for multiple reasons and plaintiff asserts only that Carter Reed falsely advertised a link between levels of cortisol and belly fat. Carter Reed insists that plaintiff's complaint does not allege that Relacore is "worthless" or "ineffective" for all of the purposes advertised. Carter Reed explains that Relacore's marketing, as well as packaging and labeling, emphasized that different benefits could be derived from the dietary supplement, such as loss of belly fat, mood elevation, and anxiety reduction. According to Carter Reed, because plaintiff claims only that Relacore does not reduce belly fat, but because consumers may have received some of Relacore's other advertised benefits, common issues of fact cannot predominate on a class-wide basis on the Consumer Fraud Act, unjust-enrichment, or breach-of-warranty claims.[8]

To emphasize the non-uniform nature of the Relacore marketing scheme, Carter Reed refers to a 2005 advertisement that makes no mention of weight reduction. Carter Reed also points out that proceeding on a class-action basis is also inappropriate because Carter Reed offered a money-back guarantee and, given the complexity of its distribution scheme, third-party retailers, such as

---

[8] In this appeal, Carter Reed has focused on questions of predominance of factual and/or legal issues, and superiority and manageability of the class action. It has not challenged whether plaintiff can properly represent the class of all Relacore users. *See R.* 4:32–1(a).

pharmacy stores, might have made certain (mis)representations at the time of sale. Additionally, Carter Reed challenges plaintiff's suggestion that a questionnaire or special master is a workable or lawful basis for sorting out such issues as causation and ascertainable loss.

Amicus Curiae Product Liability Advisory Council, Inc., emphasizes that a class-action lawsuit cannot be superior to a consumer requesting and receiving a refund. Amicus urges this Court to narrowly construe *Bosland v. Warnock Dodge, Inc.*, 197 *N.J.* 543, 964 *A.*2d 741 (2009), which does not require a plaintiff who brings a consumer-fraud action to first request a refund as a precondition of instituting suit. Essentially, amicus argues that had plaintiff requested a refund, she could have been made whole and would not have sustained an ascertainable loss under the Consumer Fraud Act. Amicus insists that allowing plaintiff's lawsuit to proceed will undermine the efficacy of warranties and discourage companies from offering money-back guarantees.

We begin with a general discussion of the rationale underlying class-action lawsuits, then turn to the particulars of *Rule* 4:32–1— the class-action rule—and its application to the facts of this case.

## III.

### A.

A class action, generally, permits one or more individuals to act as plaintiff or plaintiffs in representing the interests of a larger group of persons with similar claims. *See Iliadis, supra,* 191 *N.J.* at 103, 922 *A.*2d 710. At times, a large number of individuals may have valid claims related to consumer fraud or some other wrong, but those claims in isolation are "too small . . . to warrant recourse to litigation." *In re Cadillac, supra,* 93 *N.J.* at 435, 461 *A.*2d 736. The perpetrator of that fraud or wrong also may be a corporate entity that wields enormous economic power. A class action permits "claimants to band together" and, in doing so, gives them a measure of equality against a corporate adver-

sary, thus providing "a procedure to remedy a wrong that might otherwise go unredressed." *Id.* at 424, 461 *A.*2d 736. In short, the class action is a device that allows "an otherwise vulnerable class" of diverse individuals with small claims access to the courthouse. *Iliadis, supra,* 191 *N.J.* at 120, 922 *A.*2d 710; *see also Muhammad v. County Bank of Rehoboth Beach,* 189 *N.J.* 1, 17, 912 *A.*2d 88 (2006) ("The class-action vehicle remedies the incentive problem facing litigants who seek only a small recovery."), *cert. denied,* 549 *U.S.* 1338, 127 *S.Ct.* 2032, 167 *L.Ed.*2d 763 (2007). In addition, a class action furthers other policy goals, including "judicial economy," "consistent treatment of class members," and "protection of defendants from inconsistent [results]." *Iliadis, supra,* 191 *N.J.* at 104, 922 *A.*2d 710.

■ Class actions in New Jersey are governed by *Rules* 4:32–1 and –2, and require court approval, *R.* 4:32–2(a). When class certification is granted, a representative with typical claims is authorized "to sue on behalf of, and stand in judgment for, a group of similarly-situated litigants." *Iliadis, supra,* 191 *N.J.* at 103, 922 *A.*2d 710 (citation and internal quotation marks omitted).[9] "New Jersey courts ... have consistently held that the class action rule should be liberally construed." *Ibid.* (citation and internal quotation marks omitted).

That being said, no class action may proceed unless the requirements in paragraphs (a) and (b) of *Rule* 4:32–1 have been met. The precise issue in this case is whether plaintiff has satisfied one part of that test set forth in *Rule* 4:32–1(b)(3).

### B.

Carter Reed has not contested in this Court that plaintiff meets the four requirements of *Rule* 4:32–1(a). That Rule provides:

---

[9] Members of the represented class are bound by the results of the litigation, for better or worse, unless they opt out of the class-action lawsuit. *R.* 4:32–2(b)(2)(E)–(F), –2(c); *see Cooper v. Fed. Reserve Bank of Richmond,* 467 *U.S.* 867, 874, 104 *S.Ct.* 2794, 2798, 81 *L.Ed.*2d 718, 726 (1984).

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

[*R.* 4:32–1(a).]

Therefore, the four factors commonly referred to as numerosity, commonality, typicality, and adequacy of representation, *see In re Cadillac, supra,* 93 *N.J.* at 424–25, 461 *A.*2d 736, are not at issue here.

Rather, the focus of this appeal is on whether plaintiff has satisfied the requirements of *Rule* 4:32–1(b)(3). For a class action to proceed under (b)(3) of the Rule, the court must find

that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability in concentrating the litigation of the claims in the particular forum; and

(D) the difficulties likely to be encountered in the management of a class action.

[*R.* 4:32–1(b)(3).]

The core issues before us are (1) whether common issues of law and fact predominate over individual ones concerning the putative class members, (2) whether the class action is superior to a myriad of individually litigated cases, and (3) whether a class action—given the number of individual claims involved—is manageable.

 In determining whether a class representative—in this case, plaintiff—has established predominance, a court should conduct a "pragmatic assessment" of various factors. *Iliadis, supra,* 191 *N.J.* at 108, 922 *A.*2d 710 (internal quotation marks omitted). One inquiry is the significance of the common questions. *Ibid.* That inquiry involves a qualitative assessment of the common and individual questions rather than a mere mathematical quantifica-

tion of whether there are more of one than the other. *See ibid.* The second inquiry is whether the "benefit" of resolving common and presumably some individual questions through a class action outweighs doing so through "individual actions." *Ibid.* (quoting *In re Cadillac, supra,* 93 *N.J.* at 430, 461 *A.*2d 736). A third inquiry is whether a class action presents a "common nucleus of operative facts." *Iliadis, supra,* 191 *N.J.* at 108, 922 *A.*2d 710 (citation and internal quotation marks omitted).

Significantly, to establish predominance, plaintiff does not have to show that there is an "absence of individual issues or that the common issues dispose of the entire dispute," or "that all issues [are] identical among class members or that each class member [is] affected in precisely the same manner." *Iliadis, supra,* 191 *N.J.* at 108–09, 922 *A.*2d 710 (citations omitted). Indeed, in a class-action setting, "[i]ndividual questions of law or fact may remain following resolution of common questions." *Id.* at 108, 922 *A.*2d 710. All in all, a court must determine "whether the proposed class is sufficiently cohesive to warrant adjudication by" collective action through a class representative. *Ibid.* (citation and internal quotation marks omitted).

Whether a class action is superior to thousands of minor, individual actions or some other "alternative procedure[ ]" involves considerations of fairness to the putative class members and the defendant, and the "efficiency" of one adjudicative method over another. *In re Cadillac, supra,* 93 *N.J.* at 436, 461 *A.*2d 736. One factor in this assessment is whether any one individual who has suffered a wrong will have the financial wherewithal or incentive to prosecute a claim that might cost more than its worth. *Int'l Union, supra,* 192 *N.J.* at 384, 929 *A.*2d 1076.

The manageability of a class action is another factor that must be considered. Managing a state-wide class action almost always will be a difficult undertaking because "[c]omplexity is an inherent trait of class litigation." *Iliadis, supra,* 191 *N.J.* at 117–18, 922 *A.*2d 710. A court should not "simply close its doors

to ... litigants because their actions present novel and difficult questions." *Id.* at 118, 922 *A.*2d 710 (citation and internal quotation marks omitted). Although class certification may be denied on manageability grounds, such an approach is strongly disfavored. *Id.* at 117, 922 *A.*2d 710 (citing *Klay v. Humana, Inc.*, 382 *F.*3d 1241, 1272–73 (11th Cir.2004) (finding manageability "will rarely, if ever, be in itself sufficient to prevent certification of a class")).

The class-action precepts of predominance, superiority, and manageability must be applied to the causes of action pled by plaintiff. The centerpiece to plaintiff's complaint is her Consumer Fraud Act claim. We therefore turn to the elements of that claim.

## C.

The Consumer Fraud Act (CFA or the Act), *N.J.S.A.* 56:8–1 to –181, provides relief to consumers from "fraudulent practices in the market place." *Furst v. Einstein Moomjy, Inc.*, 182 *N.J.* 1, 11, 860 *A.*2d 435 (2004). A consumer may proceed with a private cause of action against a merchant under the CFA if she can show that the merchant engaged in an "unlawful practice," as defined in *N.J.S.A.* 56:8–2, and that she "suffer[ed] [an] ascertainable loss ... as a result of the use or employment" of the unlawful practice. *See N.J.S.A.* 56:8–19.[10] A consumer who proves (1) an unlawful practice, (2) an "ascertainable loss," and (3) "a causal relationship between the unlawful conduct and the ascertainable loss," *see Bosland v. Warnock Dodge, Inc.*, 197 *N.J.* 543, 557, 964 *A.*2d 741 (2009), is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees, *N.J.S.A.* 56:8–19.

An unlawful practice, as defined under the CFA, is "any unconscionable commercial practice, deception, fraud, false pre-

---

[10] Aside from the private cause of action, the Attorney General of New Jersey is empowered to enforce the CFA, *see, e.g., N.J.S.A.* 56:8-3. However, the Attorney General does not have to establish "ascertainable loss." *See Weinberg v. Sprint Corp.*, 173 *N.J.* 233, 250, 801 *A.*2d 281 (2002).

tense, false promise, [or] misrepresentation . . . in connection with the sale or advertisement of any merchandise. . . ." *N.J.S.A.* 56:8–2. A dietary supplement, such as Relacore, is merchandise under the CFA. *N.J.S.A.* 56:8–1 (defining merchandise as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale").

An ascertainable loss is a loss that is "quantifiable or measurable"; it is not "hypothetical or illusory." *Thiedemann v. Mercedes–Benz USA, LLC,* 183 *N.J.* 234, 248, 872 *A.*2d 783 (2005). Examples of an ascertainable loss are an out-of-pocket loss, *ibid.,* and the replacement cost of a defective product, *Furst, supra,* 182 *N.J.* at 13–14, 860 *A.*2d 435. Moreover, to prove an ascertainable loss, a consumer—particularly one among a class of consumers with nominal claims—does not have to show "that a pre-suit demand for a refund" was made. *Bosland, supra,* 197 *N.J.* at 561, 964 *A.*2d 741.

Finally, causation under the CFA is not the equivalent of reliance. *Int'l Union, supra,* 192 *N.J.* at 389, 929 *A.*2d 1076 (noting that CFA "essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss"); *Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 590, 607, 691 *A.*2d 350 (1997) (noting that CFA "does not require proof of reliance"). To establish causation, a consumer merely needs to demonstrate that he or she suffered an ascertainable loss "as a result of" the unlawful practice. *N.J.S.A.* 56:8–19; *see also Meshinsky v. Nichols Yacht Sales, Inc.,* 110 *N.J.* 464, 473, 541 *A.*2d 1063 (1988) (discussing causation under CFA).

Because it is "remedial legislation," the CFA is "construe[d] liberally to accomplish its broad purpose of safeguarding the public." *Furst, supra,* 182 *N.J.* at 11–12, 860 *A.*2d 435. We now apply the principles of *Rule* 4:32–1(b)(3) to the CFA claim and the record before this Court to determine whether the trial

court and Appellate Division properly denied plaintiff's motion for class certification.

## IV.

Carter Reed and plaintiff advance arguments based on diametrically different views of the record. The dispute over what is the *true* record, inevitably, drives the parties' legal analysis in opposite directions.

Carter Reed claims that plaintiff has challenged only the marketing of Relacore as a weight-reducing dietary supplement and that plaintiff either does not dispute or has abandoned any claim that Relacore provides other benefits, such as mood elevation and anxiety reduction. Having presented the record that way, Carter Reed argues that certifying the class of all Relacore purchasers will inevitably spawn a host of individual questions concerning why a particular consumer bought Relacore and whether the advertised benefits were realized.

On the other hand, plaintiff insists that she has alleged that Relacore offers none of the benefits advertised by Carter Reed, that no sound scientific evidence supports Carter Reed's representations about Relacore, and that Carter Reed's entire marketing scheme is nothing more than a web of lies. Under that scenario, all Relacore purchasers would have bought the product based on at least one of the false benefits promised.

Before determining whether the trial court properly denied class certification under *Rule* 4:32–1(b)(3), we must have an understanding of the "common nucleus of operative facts" that make up the record. *Iliadis, supra,* 191 *N.J.* at 108, 922 *A.*2d 710 (citations and internal quotation marks omitted). To do that, we must return to the standard of review. As indicated earlier, at the class-certification stage, a court must accept the allegations of the complaint as true. *Int'l Union, supra,* 192 *N.J.* at 376, 929 *A.*2d 1076.

A.

*The Record*

Under the heading of "operative facts," in paragraph 25 of her complaint, plaintiff alleges that Carter Reed made "unsubstantiated, deceptive, and misleading claims" that Relacore "shrink[s] belly fat, improve[s] users' mood, and combat[s] the medical condition known as 'metabolic syndrome.'" In paragraph 29, plaintiff alleges that "there is no sound scientific basis ... that Relacore balances hormone levels, reduces anxiety, or alters mood." In paragraph 33, plaintiff alleges that Carter Reed offered a false testimonial from "Dr." Chevreau "describing Relacore as a 'non-sedative anti-anxiety mood enhancer that reduces cortisol production by minimizing stress,' and that '[t]hose who take Relacore report an overall feeling of well-being, less anxiety, and much more energy and a greater ability to handle the problems of everyday life.'" In paragraph 36, plaintiff alleges that "Relacore's labeling and packaging reiterate defendants' false, misleading, and unsubstantiated claims about the product" as a "'Stress Reducer/Mood Elevator' that 'Helps Prevent Stress-Related Fat.'"

Those detailed factual allegations are not a mere parroting of the legal requirements of *Rule* 4:32–1, *see Iliadis*, 191 *N.J.* at 107, 922 *A.*2d 710, but paint a picture of a far-flung fraud. A faithful review of the complaint does not support Carter Reed's repeated assertions that plaintiff challenges only one of Relacore's advertised benefits. Nor do we find—as Carter Reed maintains—that plaintiff abandoned at the trial or appellate levels the assertions in her complaint. Indeed, plaintiff's counsel clearly declared at oral argument before this Court that plaintiff was not making a selective attack on the efficacy of Relacore, but rather asserting that all of Carter Reed's claims about Relacore—including the stress-reduction, mood-enhancement, and weight-loss claims— were "false," "unsubstantiated," and "unsupported." Counsel further submitted that "[i]f at trial I offer medical and scientific expert testimony that there is no stress, cortisol, or belly fat link,

... that the ingredients of this product aren't capable of enhancing mood or reducing stress ..., those issues can be tried on a common class wide basis." Clearly, plaintiff's position has been that Carter Reed primarily markets Relacore as a weight-loss product, but plaintiff also has taken the position that all of Relacore's purported benefits are illusory. Thus, Carter Reed's 2005 advertisement that omits the weight-reduction benefits of Relacore does not change the equation.

The class-certification discovery, moreover, does not resolve the allegations in the complaint, which remain disputed. The deposition testimony of both plaintiff and Carter Reed's compliance specialist do not answer whether the claims about Relacore—pro and con—are scientifically supported.[11] Ultimately, the core dispute between plaintiff and Carter Reed—whether Relacore delivers the benefits promised as advertised—will probably depend on expert testimony presented by the parties.

For purposes of the class-certification motion, neither the trial court nor Appellate Division accepted as true plaintiff's detailed allegations that all of Relacore's advertised benefits were false. Because those courts failed to give a deferential view to plaintiff's case at the class-certification stage, they applied legal principles to a distorted picture of the record. Had the trial court favorably viewed plaintiff's factual claims, it would not have formulated fourteen individual questions—questions that assume that Carter

---

[11] Plaintiff, it would seem, is prepared to support her allegations with expert testimony at a trial on the merits. The trial court's decision noted that one of plaintiff's experts, Jonathan Waitman, M.D., an internist and expert in clinical nutrition, rendered an opinion "that there is no scientific basis for the claims of the [efficacy] of Relacore as to stress relief, mood elevating energizing qualities, mitigation of Metabolic Syndrome, reduction of belly fat, or reduction of cortisol level." Nonetheless, we give no weight to Dr. Waitman's report. The trial court struck the report, which was offered for class-certification purposes, because it was submitted beyond the class-certification discovery period. Nor do we give any weight to plaintiff's references to an ongoing action by the Federal Trade Commission into the marketing of Relacore.

Reed will prevail in showing that Relacore provides at least some of the benefits for which it has been marketed.

In addition, the Appellate Division erred in believing that plaintiff was pursuing a common-law fraud claim. None was pled in plaintiff's second-amended complaint.[12]

Viewing the record in a light favorable to plaintiff, common issues of law and fact predominate over individual ones.

## B.

### *The Consumer Fraud Act*

#### *Predominance*

The Consumer Fraud Act provides relief to plaintiff and the putative class if Carter Reed engaged in the deceptive marketing of Relacore, *N.J.S.A.* 56:8–2, and plaintiff and the class members suffered an ascertainable loss causally related to that alleged unlawful practice, *N.J.S.A.* 56:8–19. *Bosland, supra,* 197 *N.J.* at 557, 964 *A.*2d 741. No one disputes that a deceptive marketing scheme would constitute an unlawful practice under the CFA.

In their analyses, the trial court and Appellate Division implicitly assumed that Relacore produced some of the benefits advertised. That assumption made causation—determining whether a Relacore purchaser bought the product based on a fictional or real benefit—a perplexing problem, the resolution of which would depend on a number of individual inquiries. Proving that the deceptive marketing of Relacore is causally related to an ascertainable loss under the CFA is not so problematic from a class-wide perspective if the allegations in plaintiff's complaint are accepted as true.

Plaintiff has declared that she will show that Carter Reed falsely represented the essential characteristics of Relacore. Significantly, Relacore—a pill—is a "credence" good that is known

---

[12] Plaintiff had abandoned that theory at an earlier stage of the case.

only through the benefits promised by the product's manufacturer and distributor at the time of purchase. *See* Richard A. Posner, *An Economic Approach to the Law of Evidence*, 51 *Stan. L.Rev.* 1477, 1489 (1999) ("A good is a credence good if the consumer cannot readily determine its quality by inspection or even use, so that he has to take its quality 'on faith.' "); Charles J. Walsh and Marc S. Klein, *From Dog Food to Prescription Drug Advertising: Litigating False Scientific Establishment Claims Under the Lanham Act*, 22 *Seton Hall L.Rev.* 389, 399 (1992) ("Drugs are true 'credence' goods because they possess qualities that cannot be evaluated through normal use. The assessment of a drug's qualities normally requires complex, time-consuming, and costly studies."). A rational consumer does not randomly take a bottle of pills off a shelf and then purchase it without reading the packaging and labeling or without knowing something about the product.

If Relacore offered none of the benefits claimed in Carter Reed's multi-media advertising campaign, then it would make little difference whether a class member purchased the product because of one false promise, e.g., belly-fat reduction, or another, e.g., anxiety reduction, or whether Carter Reed communicated its deceptions through magazines, commercial advertisements, or packaging and labeling, or through third persons who themselves were deceived by the overall marketing scheme. If the entire marketing scheme was based on the fictional benefits that Relacore offered, then whether the class member enjoyed good or impaired health or took other medication would hardly matter.

A corporate defendant engaged in a marketing scheme founded on a multiplicity of deceptions should not be in a better position in fending off a motion for class certification than a defendant engaged in a sole marketing deception. If all of the promised benefits of Relacore are based on untruths and disseminated through false advertising, whatever the medium, a trier of fact may fairly infer that a consumer purchasing the product was influenced, in some way or other, by the false-marketing scheme. When all the representations about the product are baseless, a

trier of fact may infer the causal relationship between the unlawful practice—the multiple deceptions—and the ascertainable losses, the purchases of the worthless product. *See Model Jury Charge (Civil)* § 1.12 (General Provisions for Standard Charge) (Nov. 1998) ("Inferences are deductions or logical conclusions [that may be] drawn from the evidence."); *Black's Law Dictionary* 847 (9th ed. 2009) (defining "inference"). It bears repeating that the CFA "does not require proof of reliance," but only a causal connection between the unlawful practice and ascertainable loss. *Gennari, supra,* 148 *N.J.* at 604, 607, 691 *A.*2d 350.

Under plaintiff's scenario, the ascertainable loss here is the purchase price of a bottle of broken promises. Each purchase of Relacore—not refunded—is an out-of-pocket loss. *See Thiedemann, supra,* 183 *N.J.* at 248, 872 *A.*2d 783. Needless to say, individual questions will remain. The number of bottles of Relacore purchased by a class member, the price of each bottle, and whether a refund was received are all individual questions that would have to be addressed. Many of the relevant records are in the possession of Carter Reed, which primarily sold Relacore through its website and toll-free number. In other instances, class members would have to offer proof of purchase. The individual questions posed, however, do not present an onerous burden to plaintiff, much less an insuperable obstacle.

### *Superiority*

We are satisfied that the class action is a superior vehicle—and perhaps the only practical vehicle—for consumers who were allegedly deceived into purchasing Relacore. It is not likely that thousands of individual consumers, purportedly duped into purchasing a worthless product that cost only about $40, will file actions in small claims court. The discovery and litigation costs, including expert-witness fees, make a lawsuit against a determined corporate adversary a costly undertaking. The whole point of a class action is to provide a diffuse group of persons, whose claims are too small to litigate individually, the opportunity to engage in

collective action and to balance the scales of power between the putative class members and a corporate entity.

We reject Carter Reed's argument that its refund policy provided every dissatisfied purchaser a *superior* alternative to a lawsuit. Carter Reed's contention that Relacore purchasers who did not seek a refund should be estopped from claiming an ascertainable loss is flawed both factually and legally. First, the money-back guarantee appeared in some but not all of Carter Reed's advertising. Thus, we cannot be certain of the percentage of Relacore purchasers who would have known about the refund policy. Significantly, the money-back guarantee did not appear on the packaging and labeling of Relacore, at least from what we can discern from the record before us.

Second, the money-back guarantee appears to have been limited to a thirty-day period after purchase. Those Relacore users who were waiting for the beneficial effects of the product to kick in after consuming the second or third bottle would fall beyond the thirty-day window for at least one or more bottles.[13]

Last, and most importantly, in *Bosland, supra,* we specifically declared that a refund policy—particularly in the case of small claims—would not immunize a merchant from a CFA claim. 197 *N.J.* at 561, 964 *A.*2d 741. In that case, we declined to read into the CFA a requirement that a consumer first demand a refund before having the right to pursue a CFA lawsuit. *Ibid.* We observed that such an approach would "create a safe harbor for an offending merchant," one at odds with the CFA's salutary purposes. *Ibid.* Moreover, we did not believe that, in crafting the CFA, the Legislature intended to provide relief "only to those consumers who are alert enough to ask for a refund, while allowing the offending merchant to reap a windfall." *Ibid.*

---

[13] That Carter Reed may have provided refunds to some purchasers beyond the thirty-day period would be of little solace to those who believed that they could not file for a refund outside the allotted timeframe. That, of course, presumes the Relacore user knew of the refund policy in the first place.

We have little difficulty in concluding that a class-action is the superior means of vindicating the rights of consumers who claim to have been wronged by Carter Reed's marketing of Relacore.

*Manageability*

Finally, we conclude that a class action in this case is not unmanageable. Denying class certification on manageability grounds is disfavored in general and not in any way justified in this particular case. Class actions by their very nature are complicated creatures, but they provide an efficiency of scale and an equitable means of relief for individuals who might otherwise not have access to the courthouse or the incentive or ability to right a wrong. In *Iliadis, supra,* we expressed our confidence that "the Law Division [would] properly employ its broad, equitable authority and sound discretion to manage the instant litigation and appropriately address the important concerns of both parties." 191 *N.J.* at 117–20, 922 *A.*2d 710. Likewise here, we have an abiding belief that the Law Division has the wherewithal to shepherd this class action toward a just result without compromising the rights of any party.

We recognize that the future is oftentimes unpredictable. Plaintiff has always maintained that Relacore has been primarily marketed as a weight-reduction product. However, should it develop over the course of discovery, or even at the conclusion of a merits trial, that some of Carter Reed's claims regarding Relacore are scientifically sound, that is, Relacore in fact does reduce stress and elevate mood, an added element of complexity will have to be addressed. Needless to say, interrogatories or questionnaires to class members should help determine the reasons why any one individual purchased Relacore. The trial court always will have options at its disposal, such as subdividing the class, if necessary, or, in a worst case scenario, decertifying the class if justice cannot be achieved through a class action. *See Iliadis, supra,* 191 *N.J.* at 119–20, 922 *A.*2d 710; *R.* 4:32–2. We need not speculate on such matters. This much can be said—plaintiff must provide the

necessary evidence to support the allegations that justified the grant of class certification.

We also cannot predict the outcome of a trial. If plaintiff proves none of her claims, then damages will not be an issue, and if she proves all of her claims, then calculating damages should not be an overly cumbersome procedure. The class-action challenge will be if the trier of facts finds that Relacore provides some advertised benefits but not others. The burden will be on plaintiff who has broadly defined the class to establish the causal relationship between the unlawful practice and the ascertainable loss.

 Based on our review of the record, plaintiff's claims, Carter Reed's defenses, and the applicable substantive law, and in light of our analysis of the predominance, superiority, and manageability factors of *Rule* 4:32–1(b)(3), we hold that the trial court abused its discretion in not certifying the class of New Jersey Relacore purchasers on plaintiff's CFA claim.

## V.

Our finding that class certification should have been granted is fully in line with our recent jurisprudence on this subject. This case is dissimilar to *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 192 *N.J.* 372, 929 *A.*2d 1076 (2007), in which we struck down—on grounds of lack of predominance and superiority—the certification of a *nationwide* class-action Consumer Fraud Act lawsuit against Merck, the manufacturer and marketer of the pain medication Vioxx. *Id.* at 375–76, 390–91, 393–94, 929 *A.*2d 1076. In *International Union*, the plaintiff was "a joint union-employer Taft–Hartley trust fund" that paid Merck and other pharmaceutical companies for medications prescribed to members of its health benefit plans. *Id.* at 376–77, 929 *A.*2d 1076. The plaintiff—a third-party payor—alleged that Merck's fraudulent marketing of Vioxx as safer and more effective than similar medications caused Vioxx to be priced higher than those medications. *Ibid.* The Law Division granted certification to a nationwide class of purportedly similarly situated third-party,

non-government payors who claimed they were duped into giving Vioxx a preferred status as a result of Merck's fraudulent marketing campaign. *Id.* at 375–76, 929 *A.*2d 1076. The Appellate Division affirmed, and we reversed. *Id.* at 376, 929 *A.*2d 1076.

In contrast to this case, *International Union* involved a proposed class of diverse entities, which the plaintiff did not suggest "reacted in a uniform or even similar manner" to the same information broadcast by Merck. *Id.* at 390, 929 *A.*2d 1076. The record suggested that each putative class member "made individualized decisions concerning the benefits that would be available to its members for whom Vioxx was prescribed" and that "common fact questions surrounding what [Merck] knew and what it did would not predominate." *Id.* at 391, 929 *A.*2d 1076. Moreover, a class action was not necessarily a superior vehicle in *International Union.* The putative class members were "well-organized institutional entities with considerable resources." *Id.* at 394, 929 *A.*2d 1076. Thus, unlike this case, there was "no disparity in bargaining power" and "no likelihood" that the plaintiff—which claimed a "relatively large sum of damages"—would not pursue an individual action. *Id.* at 393–94, 929 *A.*2d 1076.

The present case is more like *Iliadis v. Wal–Mart Stores, Inc.,* 191 *N.J.* 88, 922 *A.*2d 710 (2007), which is "the quintessential example of facts and circumstances that would support class-wide relief." *Int'l Union, supra,* 192 *N.J.* at 394, 929 *A.*2d 1076. In *Iliadis, supra,* we overturned the denial of class certification to a proposed class of approximately 72,000 current and former Wal–Mart employees who claimed that their employer failed to abide by its contractual obligations to compensate them for all time worked. 191 *N.J.* at 95, 922 *A.*2d 710. We found that common issues predominated despite the numerous individual inquiries that remained, such as whether particular employees voluntarily worked during their rest and meal breaks, whether those employees who worked off-the-clock expected to be compensated, and the amount of damages each employee suffered, if any. *Id.* at 112–13, 922 *A.*2d 710. In many respects, *Iliadis* presented a much more

complex class action—with many more individual issues—than the case before us. Notably, as here, in *Iliadis* the class action was a superior adjudicative method because of "the nominal value of each class members' claim" and because "if the proposed class [was] not certified, thousands of aggrieved employees [would] not seek redress for [Wal–Mart's] alleged wrongdoing." *Id.* at 114–17, 922 *A.*2d 710.

## VI.

Both the trial court and Appellate Division erred by not adhering to the standard of review that governs consideration of class certification—viewing the record in a light favorable to plaintiff. Those courts failed to accept plaintiff's assertions that she was challenging all of Carter Reed's advertised benefits regarding Relacore.

On the present record, we decline to resolve whether class certification should be granted on the unjust-enrichment and express- and implied-warranty claims. Those claims were addressed only in a footnote in the Appellate Division's opinion and were not fully briefed or argued before this Court.[14] We vacate the trial court's denial of class certification on those claims and remand to the trial court for consideration under the standards enunciated in this opinion.[15]

## VII.

In summary, the trial court mistakenly exercised its discretion in not granting class certification on plaintiff's Consumer Fraud

---

[14] The Appellate Division affirmed the trial court's denial of class certification of plaintiff's unjust-enrichment and warranty claims "[f]or the same reasons" it gave for upholding the denial of certification on the CFA claim.

[15] Nor do we consider whether class certification should be granted for the injunctive relief pled in plaintiff's second-amended complaint. Neither the trial court nor Appellate Division addressed the issue, nor has plaintiff pressed the matter before this Court.

Act claim. We also vacate the denial of class certification on her unjust-enrichment and express- and implied-warranty claims and direct the trial court to reconsider whether or not class certification is appropriate on those claims. We therefore reverse the judgment of the Appellate Division, which upheld the denial of class certification on all claims, and remand to the trial court for proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.